**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X

LANA STELMAN,

                                    Plaintiff,

                    -against-

UNITED STATES OF AMERICA,

                                    Defendant.

------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __ 9/21/2016 __

14-CV-05363 (SN)

**<u>OPINION & ORDER</u>**

**SARAH NETBURN, United States Magistrate Judge:**

    Lana Stelman alleges that her inadequate medical care while in the custody of the Bureau of Prisons ("BOP") resulted in a preventable bowel re-section surgery in 2012 and a 2013 post-operative wound infection that required surgery. She argues that her treatment violated her constitutional rights and brings claims under the Federal Tort Claims Act ("FTCA") for negligence and medical malpractice.

    The Government moves for judgment on the pleadings and summary judgment. It argues that Stelman's constitutional claims should be dismissed because the United States has not waived sovereign immunity for constitutional torts. It seeks summary judgment on Stelman's negligence claims because they merge with her malpractice claims. And it seeks partial summary judgment on Stelman's malpractice claims insofar as they arose from her incarceration at MCC New York, where she received some medical care, as opposed to FCI Miami, where she received virtually none. The Government also challenges the admissibility of Stelman's proffered expert testimony.

The Court grants judgment on the pleadings on the constitutional tort claims because the United States has not waived sovereign immunity for those claims. The Court grants summary judgment on Stelman's negligence claims because she does not assert a violation of a duty apart from the duty to provide medical care. But the Court denies summary judgment on Stelman's medical malpractice claims arising from her treatment at MCC New York. Stelman's proffered expert testimony is admissible with regard to the standard of gastroenterological care but not admissible with regard to the standard of psychiatric care or postoperative wound care. Stelman will be barred from arguing at trial that her psychiatric care at MCC New York fell below the standard of care. She will be allowed, however, to argue that her wound care was malpractice because a rational factfinder could conclude that her wound care was so inadequate as to fall below any standard of care.

## **BACKGROUND**

### I.      **Pre-Incarceration Medical History**

At the time of her arrest, Stelman had suffered from Crohn's disease for more than 20 years. Between 1990, when she was first diagnosed with the disease, and 2000, she suffered monthly hospitalizations, four bowel re-section surgeries, in which portions of her bowel were removed, and a surgery to repair and drain a liver duct abscess. She moved to the Dominican Republic in 2009, and she took no Crohn's medication for the first year, resulting in several hospitalizations. Eventually, in approximately 2010, a gastroenterologist prescribed Pentasa, a brand name for mesalamine. According to Stelman, Pentasa successfully controlled her Crohn's disease; after starting the drug, she had only one recurrence when she briefly went off it. Stelman also controlled her Crohn's disease with anti-anxiety medication and Nexium, a drug that reduces gastrointestinal acid.

## II.        Incarceration at FCI Miami

On August 6, 2012, federal agents arrested Stelman and brought her to FCI Miami, where all of her medicine was confiscated. During a screening interview, she reported her Crohn's disease and other ailments and emphasized the importance of regularly taking her medication. FCI Miami, however, did not provide Stelman with any medication, and the symptoms of her Crohn's disease returned.

On August 9, 2012, Stelman met with FCI Miami staff psychologist Ada Aponte after another inmate told Aponte that Stelman was in crisis. Stelman told Aponte that she had Crohn's disease and urgently needed to take her medication. Aponte testified that she contacted medical staff regarding Stelman's medication. Despite Aponte's intervention and instructions from a federal judge, Stelman never received any prescription medication at FCI Miami.

## III.       Incarceration at MCC New York

On August 14, 2012, the Government transferred Stelman to MCC New York. When she arrived, she was suffering from serious diarrhea, abdominal pain, and vomiting. Dr. Anthony Bussanich, then MCC New York's clinical director, treated her. He diagnosed her with anxiety and Crohn's disease, assigned her to the chronic care clinic, and prescribed mesalamine for Crohn's, buspirone for anxiety, doxepin for depression, and omeprazole for esophageal reflux. Consistent with the MCC's formulary, each of the prescriptions was a generic drug. Dr. Bussanich had treated between five and ten patients for Crohn's disease; only one of his patients had ever had a bowel resection.

### A.        Stelman's Bowel Re-Section Surgery

On September 4, 2012, Dr. Bussanich increased Stelman's buspirone and doxeprin dosages and ordered an abdominal x-ray that showed a possible bowel obstruction. She returned

to the clinic on September 17, 2012, with complaints of abdominal pain, nausea, and watery stool caused by her Crohn's disease. Stelman returned again on September 21 and 23, complaining of continued abdominal pain. An x-ray showed a dilated left lower colon loop, and she exhibited hypoactive bowel sounds and tenderness on examination. On September 24, 2012, Dr. Bussanich sent Stelman to New York Downtown Hospital ("NYDH") for evaluation and a CAT scan. NYDH physicians told Dr. Bussanich that CAT scans did not show abdominal blockage. A September 28, 2012 NYDH consultation note recommended treatment with prednisone and Pentasa. Nevertheless, the MCC continued providing Stelmen with generic mesalamine.

Approximately two weeks later, Stelman underwent bowel re-section surgery after complaining of increasing abdominal pain.

### B.      Stelman's 2013 Wound Infection and Surgery

On September 6, 2013, Stelman was admitted to Kingsbrook Jewish Medical Center for hernia surgery. She developed an abscess while hospitalized, and it burst before her discharge on September 20, 2013. She testified that a Kingsbrook physician told her to tell the MCC physicians to check, clean, and change the bandage two-to-three times a day. She testified that she relayed those wound care instructions to Dr. Bussanich, but her bandage was not changed two-to-three times a day. She testified that she complained to Dr. Bussanich that her wound care was inadequate but ultimately had to clean the abscess site herself. According to Stelman, medical personnel told her counselor that the medical office would not "clear the floor of all the men for one female. They were too busy." ECF No. 39-3 at 12. Instead, they gave the counselor gauze to give to Stelman.

4

On September 21, 2013, Stelman's dressing was changed by MCC staff, who noted that her bandage was wet from discharge. On September 22, 2013, she went to the clinic for a "dressing change" and reported that she "had yellowish to green drainage." ECF No. 37-4 at 1. But clinicians saw only "minimal serosanguinous dressing on the gauze." ECF No. 37-4 at 1. According to treatment notes, her wound appeared "clean," she had "no edema, no surrounding erythema or warmth, positive granulation tissue, no drainage (no blood or pus), degree of tenderness" was "questionable." Id. Clinicians gave her additional gauze to use after she showered. Id. at 2. The Government claims that physicians gave her a dressing change, but the medical record does not definitively say that a dressing change occurred. Stelman contends that a dressing change was not done. See ECF No. 39 at 15 (Pl.'s Rule 56.1 Statement). She returned to the clinic on September 24, 2013, for a dressing change. She reported experiencing an "intermittent burning sensation" in the area surrounding her wound. ECF No. 37-3 at 41. She reported "yellowish to red drainage," but "at presentation she had no drainage." Id. She had previously changed her own bandage. The parties dispute whether a dressing change was done in the clinic. See ECF No. 39 at 15 (Pl.'s Rule 56.1 Statement). On September 25, 2013, Stelman did not appear for her scheduled dressing change. Treatment notes indicate that a female chaperone was not available. ECF No. 37-3 at 38. She appeared approximately two hours later for her dressing change but had changed her own dressing "because it was soaked." Id. at 36. She had redness near her wound and complained of pain "on slight touch." Id.

On September 26, 2013, Stelman's wound had become badly infected. When she appeared for her dressing change, she reported that the feeling of burning was "worsening" and that "pain and burning is spreading upward in the abdomen." Id. at 32. Her wound appeared "erythematous," or reddish from infection, and "positive tenders to palpitation" extended from

the area surrounding her jejostomy tube three centimeters up her abdomen. Id. at 33. She was transferred to the hospital, where surgery was required to drain the abscess.

On January 31, 2014, Dr. Bussanich reported that Stelman's "Crohn's disease appears to be in remission. She has refused Mesalamine, is on no TNF inhibitor . . . and has had no recent flare ups of her Crohn's." Id. at 15. According to Bussanich's treatment notes, her Crohn's continued to be in remission on March 14 and 24, 2014. In May 2014, she was moved from the MCC to her designated institution in Carswell, Texas, where she took mesalamine and Humira, which kept her Crohn's stable. She was released from federal custody in January 2016.

## IV.    The Notices of Claim

On October 29, 2013, Stelman filed a notice of claim with the BOP for damage, injury, or death. The notice asserted that Stelman had suffered "[e]xacerbation of Crohn's disease, abdominal pain, bowel obstruction, diarrhea, weakness, surgical resection of bowel, liver abscess, surgical infections, infections, hernia, surgical scarring," and "multiple hospitalizations." ECF No. 42-1 at 2. In a section with the subheading "Basis of claim and injury," Stelman asserted that the claim was "for personal injuries" suffered as a result of "negligence and or medical malpractice on the part of the Bureau of Prisons." Id. at 4. She specified that she "suffered severe abdominal pain and an abdominal obstruction related to her denial of medication while a prisoner and under the care of the Federal Bureau of Prisons at the FDC and FTC from the date of her arrest on August [6], 2012 till the end of September, 2012." Id. at 5. The notice described her medical treatment between August 2012 and February 2013, and it included her medical records from August 6, 2012, until January 2013. The notice did not describe any Government conduct after September 2012.

Stelman's supplemental notice of claim, received by BOP on January 13, 2014, included additional allegations involving the events of 2013. She alleged that, upon discharge from the hospital after her September 2013 hernia surgery, she was "provided gauze pads and was told to apply 3 to 4 times a day." ECF No. 45-7 at 6. She alleged that when she returned to MCC New York, Dr. Bussanich told her that he could see her only once a day "and that she should apply the gauze pads herself." Id. She alleged that "because of prison regulations," she did not receive enough medical tape and had to use Scotch tape instead. Id. She eventually suffered a "massive infection" requiring two surgeries. Id.

## V.      The Complaint

Stelman asserted violations of her constitutional rights, medical malpractice, and negligence. She claimed that FCI Miami failed to give her any medical care at all. With respect to her incarceration at MCC New York, she claims that the course of treatment for her Crohn's disease fell below the standard of care and that she received insufficient wound care after her hernia surgery, which resulted in an infection requiring two further surgeries.

## VI.     Plaintiff's Expert

Stelman proffered as her expert Dr. Mark A. Korsten, Chief of Gastroenterology at the James J. Peters VA Medical Center and Professor of Medicine at Columbia University College of Physicians and Surgeons. He reviewed Stelman's health records from the Bureau of Prisons, the New York Department of Health, and Kingsbrook Jewish Medical Center, her deposition transcript, and Dr. Bussanich's deposition transcript. Dr. Korsten opined that the medical staff at the FDC Miami and the MCC New York departed from the standard of medical care and caused her injury. He opined that the failure to continue Stelman's course of Pentasa treatment and to

prescribe proper anti-anxiety drugs led to flare-ups of her Crohn's disease. He testified that inadequate wound care at MCC New York led to infection and the resulting surgery.

### A.    Failure to Continue Pentasa

According to Dr. Korsten, the BOP's failure to continue Stelman's treatment on Pentasa departed from the standard of care. He testified that because Stelman's medications had controlled her Crohn's disease before her incarceration "all the medications that she was taking previously should have been continued." ECF No. 36-2 at 9 (Korsten Dep.). He testified that the generic mesalamine that Dr. Bussanich prescribed for Stelman upon her arrival at the MCC was not an adequate substitute for brand-name Pentasa. According to Dr. Korsten, the coating in Pentasa was designed to release mesalamine drug in the small intestine and "has been shown to be useful in the treatment of small bowel Crohn's disease." Id. at 11. By contrast, some types of generic mesalamine were "designed to be released in the colon as opposed to the small bowel" and would be ineffective at treating Stelman's Crohn's disease. Id. at 12. Based on available medical records, he could not determine the type of coating on the generic mesalamine.

### B.    Failure to Continue Anxiety Medication

Dr. Korsten also opined that the BOP's failure to continue Stelman's anti-anxiety medication was a deviation from the standard of care. According to Dr. Korsten, the failure to continue Stelman's anxiety medication upon her arrival at FCI Miami exacerbated the symptoms of her Crohn's disease. Dr. Korsten acknowledged that Dr. Bussanich prescribed anti-anxiety medication for Stelman on August 17, 2013, shortly after her arrival at MCC New York, but testified that the "receipt of the medication" was "delayed," leading to flare-ups of her Crohn's disease. ECF No. 36-3 at 6. Dr. Korsten also opined that Stelman should have been put on the same anxiety medication that she took in the Dominican Republic, but acknowledged that he did

not know which medications she had previously taken. He testified that any deviation in her course of treatment should have been overseen by a psychiatrist or clinical psychologist.

### C.      Failure to Consult Gastroenterological and Psychiatric Specialists

Dr. Korsten opined that the BOP's failure to request gastroenterological and psychiatric consultations for Stelman was a deviation from the standard of care in light of her history of Crohn's disease. According to Dr. Korsten:

> A consultation with a gastroenterologist would have resulted in recommendations for more specific treatment of the problem. I mean, there was no treatment for the first 10 days of her confinement, but then she was not doing well. And certainly at that point there were a lot of things you could institute, from steroids, specifically, that can have short-term benefit . . . . [G]iven that she was getting acutely ill, one of the new biologics might have been an option, biologics like those tumor necrosis factor antibodies, Remicade or Humira. She was getting sick, and nothing much was being done to abort the increasing severity of her illness.

ECF No. 36-4 at 12-13. He also testified that a psychiatric consultation "would have resulted in specific recommendations for more adequate treatment of anxiety and depression, both of which can exacerbate symptom expression and should have been provided." Id. at 13.

### D.      Post-Operative Wound Care

Dr. Korsten opined that the BOP failed to provide "standard post-operative care," which "resulted in the need for two additional operations." ECF No. 36-1 at 4 (Korsten Rep.). But he testified almost exclusively about wound care Stelman received in 2012 after her bowel re-section and abdominal wall surgeries. He noted in passing that the 2013 hernia repair "also required, obviously, attention, and that would be an additional potential wound that could become infected." Id. at 3. He did not describe what he believed the MCC New York physicians had done wrong in 2013.

9

### E.      Long-Term Complications

Dr. Korsten testified that the BOP's purportedly inadequate medical care "resulted in significant morbidity . . . ." ECF No. 36-1 at 5 (Korsten Rep.). According to Dr. Korsten, Stelman had "permanent damage" including "removal of part of her bowel," which "can eventually have very significant complications." ECF No. 36-4 at 13. He testified that Stelman suffered "pain, discomfort, anxiety . . . and the heightened likelihood of shortened bowel syndrome" and other complications including damage to the musculoskeletal system, arthritis, and liver disease. ECF No. 36-5 at 3-4. He concluded that "the likelihood of future surgery was increased by the experience she had in the Bureau of Prisons." Id. at 8.

## VII.   The Present Motion

The Government now moves for partial summary judgment and judgment on the pleadings. According to the Government, it is entitled to judgement on the pleadings or summary judgment with respect to: (1) Stelman's constitutional claims; (2) Stelman's negligence claim; and (3) Stelman's medical malpractice claim for her care and treatment while at MCC New York. The Government does not move for judgment on Stelman's claim for medical malpractice while incarcerated at FCI Miami.

## ANALYSIS

## I.      Standards of Review

### A.      Judgment on the Pleadings

A motion for judgment on the pleadings should be granted if it is clear from the pleadings that "the moving party is entitled to judgment as a matter of law." Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am. (UPGWA) & Its Local 537, 47 F.3d 14, 16 (2d Cir. 1995). The standard of review is "identical to that of a Rule 12(b)(6) motion for failure to

state a claim." <u>Patel v. Contemp. Classics of Beverly Hills</u>, 259 F.3d 123, 126 (2d Cir. 2001). A

plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." <u>Brown v.</u>

<u>Daikin Am. Inc.</u>, 756 F.3d 219, 225 (2d Cir. 2014) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550

U.S. 554, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009). While the "plausibility

standard is not akin to a probability requirement," <u>id.</u> (internal quotation marks omitted), the

plaintiff must nudge a claim "across the line from conceivable to plausible . . . ." <u>Twombly</u>, 550

U.S. at 570. A court must take "factual allegations to be true" and draw "all reasonable

inferences in the plaintiff's favor." <u>Harris v. Mills</u>, 572 F.3d 66, 71 (2d Cir. 2009) (citation

omitted). Legal conclusions conversely do not benefit from a presumption of truth. <u>See Iqbal</u>,

556 U.S. at 678.

### B.    Summary Judgment

Under Federal Rule of Civil Procedure 56, the Court "shall grant summary judgment if

the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); <u>see Celotex Corp. v. Catrett</u>, 477

U.S. 317, 322-23 (1986). The moving party must show that "under the governing law, there can

be but one reasonable conclusion as to the verdict." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S.

242, 250 (1986). The moving party bears the initial burden of establishing that there are no

material facts in dispute and must provide "affirmative evidence" from which a factfinder could

return a verdict in its favor. <u>Id.</u> at 257. Then "the burden shifts to the non-movant to point to

record evidence creating a genuine issue of material fact." <u>Salahuddin v. Goord</u>, 467 F.3d 263,

273 (2d Cir. 2006). "[T]he trial court's task at the summary judgment motion stage of the

litigation is carefully limited to discerning whether there are any genuine issues of material fact

to be tried, not deciding them. Its duty, in short, is confined at this point to issue-finding; it does

not extend to issue-resolution." Gallo v. Prudential Residential Servs., LP, 22 F.3d 1219, 1224

(2d Cir. 1994).

In determining whether summary judgment is appropriate, the Court must resolve all

ambiguities and draw all reasonable inferences in the light most favorable to the non-moving

party. See Scott v. Harris, 550 U.S. 372, 378 (2007). Summary judgment is improper if "there is

any evidence in the record from any source from which a reasonable inference could be drawn in

favor of the nonmoving party . . . ." Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir.

1994). To create a disputed fact sufficient to deny summary judgment, the non-moving party

must produce evidence in the record and "may not rely simply on conclusory statements or on

contentions that the affidavits supporting the motion are not credible . . . ." Ying Jing Gan v. City

of New York, 996 F.2d 522, 532 (2d Cir. 1993). Instead, the response "must set forth specific

facts demonstrating that there is a genuine issue for trial." Wright v. Goord, 554 F.3d 255, 266

(2d Cir. 2009) (citation and internal quotation marks omitted).

## II.     Stelman's Constitutional Claims

The Government argues that it is entitled to judgment on the pleadings with respect to

any constitutional claims alleged in Stelman's complaint. Stelman does not oppose this part of

the Government's motion.

"The United States, as sovereign, is immune from suit save as it consents to be sued,"

United States v. Sherwood, 312 U.S. 584, 586 (1941), and the United States "has not waived its

sovereign immunity with respect to claims that its employees have committed constitutional

torts." Castro v. United States, 34 F.3d 106, 110 (2d Cir. 1994). Instead, "a claimant's exclusive

remedy for nonconstitutional torts by a government employee acting with the scope of his employment is a suit against the government under the FTCA." Id.

Because the United States has not consented to suit with respect to claims that its employees have committed constitutional torts, the Court dismisses Stelman's constitutional claims for lack of jurisdiction.

## III.    Stelman's Negligence Claims

The Government argues that Stelman's negligence claims should be dismissed as duplicative of her medical malpractice claims. Stelman counters that her negligence claims are separable from her malpractice claims because they do not concern the quality of the medical care she received while incarcerated. Instead, they concern policies and procedures that prevented her from receiving the proper level of care in the first place, despite evident signs that she was in medical distress. The Government counters that this argument should be set aside because it was raised for the first time in response to its summary judgment motion and not administratively exhausted. The Government also contends that the argument fails on its merits because it does not implicate any duty other than the BOP's duty to provide adequate medical care. The Court agrees.

### A.    Florida Claims

The FTCA allows a person to sue the Government for tort "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). Under Florida law, a court must "look to the allegations made in the complaint when determining whether a suit raises an issue of ordinary negligence or medical malpractice." S. Baptist Hosp. of Florida, Inc. v. Ashe, 948 So. 2d 889, 890 (Fla. Dist. Ct. App. 2007). A claim is one for medical malpractice, rather

than ordinary negligence, when it arises from "the rendering of, or the failure to render, medical care of services." J.B. v. Sacred Heart Hosp. of Pensacola, 635 So. 2d 945, 949 (Fla. 1994).

Stelman alleges that she did not receive any medical care while incarcerated in FCI Miami. She asserts that her complaint alleges ordinary negligence claims based on the confiscation of her medication when she was arrested, the failure to provide medication after she became ill, and the failure to provide medication despite an order from a magistrate judge. But each of these alleged breaches of duty are breaches of a duty of medical care that the BOP owed to Stelman—not a breach of some other sort of duty. Accordingly, these are claims of medical malpractice, and her claims of negligence are duplicative of her malpractice claims. Accordingly, the Court dismisses her negligence claims arising from her incarceration at FCI Miami.

Citing New York law, Stelman claims that BOP officers breached a totally separate duty owed to Stelman by failing to communicate her illness to physicians. Even assuming that New York case law is applicable to her Florida tort claim, the case she cites is distinguishable. In Huntley v. New York, 62 N.Y. 2d 134 (1984), the Court of Appeals held a psychiatric hospital negligent when a patient left the grounds unsupervised and jumped from a nearby roof. According to the Court, the hospital breached its "duty to supervise its patient adequately" when a hospital staff member failed to communicate the patient's suicidal ideation to medical staff who could have restrained the patient. Id. at 137. In short, the hospital could be held negligent because it breach *a separate duty* from its duty of providing proper medical care, that of keeping the patient safe from himself. Stelman, however, has not shown that the BOP breached a duty separate and apart from its duty of providing medical care—her claim bears "a substantial relationship to the rendition of medical treatment," and must be considered as malpractice. Annunziata v. Quest Diagnostics, Inc., 127 A.D.3d 630, 631 (1st Dep't 2015).

B.        **New York Claims**

Stelman alleges that MCC New York's policies and practices prevented her from getting proper medical care because of the strict segregation of male and female prisoners. According to Stelman, this segregation policy prevented her from going to the clinic for regular wound care, leading to her infection. The Government argues that this claim was not administratively exhausted because she did not identify these particular policies and procedures in her notice of claim. Even if the claim were exhausted, the Government argues, it too would be duplicative of Stelman's medical malpractice claim.

1.        **Exhaustion**

Ordinarily, a district court would lack jurisdiction under the doctrine of sovereign immunity to hear a suit against the United States. But the FTCA is "a limited waiver by the United States of its sovereign immunity and allows for a tort suit against the United States under specified circumstances." Hamm v. United States, 483 F.3d 135, 137 (2d Cir. 2007). Specifically, a person may sue the United States for:

> personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b).

Exhaustion of administrative remedies is a prerequisite to suit under the FTCA. An FTCA claimant may not sue unless she has "first presented the claim to the appropriate Federal agency." 28 U.S.C. § 2675(a). "The requirement that a notice of claim be filed is jurisdictional and cannot be waived." Keene Corp. v. United States, 700 F.2d 836, 841 (2d Cir. 1983). "A claim must be specific enough to serve the purpose of the FTCA to enable the federal

government to expedite the fair settlement of tort claims." <u>Romulus v. United States</u>, 160 F.3d
131, 132 (2d Cir. 1998). Accordingly, a notice "must provide enough information to permit the
agency to conduct an investigation and to estimate the claim's worth." <u>Id.</u> The United States'
waiver of immunity under the FTCA must be "strictly construed in favor of the government."
<u>Liriano v. United States</u>, 690 F.3d 78, 84 (2d Cir. 2012) (internal quotation marks omitted).

Stelman's supplemental notice of claim alleged that she suffered "personal injuries" due
to the Government's "negligence or medical malpractice." ECF No. 45-7 at 7. She specified that
she "suffered severe abdominal pain and an abdominal obstruction related to her denial of
medication while a prisoner and under the care of the Federal Bureau of Prisons at the FDC and
FTC from the date of her arrest on August [6], 2012 till the end of September 2012." <u>Id.</u> The
notice of claim also alleged that Dr. Bussanich told Stelman "that he can only see her once a
day" and that "because of prison regulations," Stelman "was only permitted to have a small
amount of tape for the gauze pads," which required her to use Scotch tape. Nowhere does the
notice of claim assert that the Government's sex-segregation policy prevented her from getting
medical care. Her allegations, therefore, were not specific enough to permit the agency "to
conduct an investigation" into the policy of sex segregation in the clinic, and the Court does not
have jurisdiction to hear a negligence claim based on that allegation.

### 2. Merits Review

Even assuming that the Court did have jurisdiction over this claim, it would fail on the
merits. In New York, the "critical factor in distinguishing whether conduct may be deemed
malpractice or ordinary negligence is the nature of the duty owed to the plaintiff that the
defendant allegedly breached." <u>Annunziata</u>, 127 A.D.3d at 631. Stelman alleges that the BOP's
sex segregation policy prevented her from receiving medical care, but that allegation sounds in

malpractice. In Stelman's view, the policy's unintended effect was to prevent her from receiving regular wound care, thus breaching the BOP's duty to provide Stelman with adequate medical treatment. But this claim implicates *only* the BOP's duty to provide medical care. As a claim bearing "a substantial relationship to the rendition of medical treatment," it sounds in malpractice, not negligence. Id. Her negligence claims are duplicative of her malpractice claims and are therefore dismissed.

## IV.    Medical Malpractice While at MCC New York

The Government moves for summary judgment on Stelman's claims that she suffered medical malpractice while at MCC New York. According to the Government, Stelman cannot establish a prima facie case of medical malpractice because her expert's testimony is inadmissible to prove an essential element of the claim: the applicable standard of care. The Government argues that Dr. Korsten improperly based his opinion on personal experience, his opinions were speculative and conclusory, and the record evidence does not support his conclusions.

The Government may disagree with Dr. Korsten's assessment of the standard of care and have strong arguments against it, but his testimony is partially admissible. Dr. Korsten had no basis for opining on Stelman's psychiatric care, and Stelman has failed to establish that her psychiatric care was malpractice. But genuine disputes over the applicable standard of care prevents the Court from entering summary judgment on the malpractice claims arising from her Crohn's treatment. And a genuine dispute of material fact prevents the Court from entering summary judgment on her wound care malpractice claim.

### A.      Standard of Admissibility

Expert testimony is admissible when:

> (a) the expert's scientific, technical, or other specialized knowledge
> will help the trier of fact to understand the evidence or to determine
> a fact in issue; (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods;
> and (d) the expert has reliably applied the principles and methods to
> the facts of the case.

Fed. R. Evid. 702. In applying Rule 702, the district court must ensure that an expert's testimony "rests on a reliable foundation and is relevant to the task at hand." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993). The court must "undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002). When conducting its analysis, the district court "must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." Id. at 266. Nonetheless, "conclusions and methodology are not entirely distinct from one another" and "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). Accordingly, a district court may exclude expert testimony if it determines that "there is simply too great an analytical gap between the data and the opinion proffered." Id.

Exclusion of expert testimony is warranted only when the district court finds "serious flaws in reasoning or methodology." In re Fosamax Prods. Liab. Litig., 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009). Otherwise, if an expert's testimony falls within "the range where experts might reasonably differ," the duty of determining the weight and sufficiency of the evidence on which

the expert relied lies with the factfinder. Kumho Tire, Co. v. Carmichael, 526 U.S. 137, 153

(1999). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction

on the burden of proof are the traditional and appropriate means of attacking shaky but

admissible evidence." Daubert, 509 U.S. at 596. "[T]he proponent of expert testimony has the

burden of establishing by a preponderance of the evidence that the admissibility requirements

under Rule 702 are satisfied." United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007).

"Because the purpose of summary judgment is to weed out cases in which there is no

genuine issues as to any material fact and the moving party is entitled to a judgment as a matter

of law, it is appropriate for district courts to decide questions regarding the admissibility of

evidence on summary judgment," including the admissibility of expert evidence. Raskin v.

Wyatt Co., 125 F.3d 55, 66 (2d Cir.1997) (internal quotation marks, citation, and alteration

omitted). Indeed, as the "gatekeeper for expert testimony," the court "performs the same role at

the summary judgment phase as at trial; an expert's report is not a talisman against summary

judgment." Id.

### B.     Dr. Korsten's Qualifications

The Government does not challenge Dr. Korsten's qualifications as an expert, but they

bear examination in order to evaluate the Government's challenge to his use of his own personal

experience as a basis for his expert opinion. Dr. Korsten is the Chief of Gastroenterology at the

James J. Peters VA Medical Center and Professor of Medicine at Columbia University College

of Physicians and Surgeons. He has published at least 25 papers over the past 10 years in

gastroenterology and related disciplines. He divides his professional time evenly between clinical

activities, research activities, and administrative activities. He sees 30 to 40 patients a week and

regularly performs gastrointestinal endoscopy. By any measure, Dr. Korsten is qualified to testify on matters of gastroenterology.

### C.    Dr. Korsten's Testimony

In his report, Dr. Korsten identified four departures from the standard of adequate medical care: (1) the failure to continue Pentasa; (2) the failure to treat Stelman's anxiety; (3) the failure to consult with specialists; and (4) the failure to provide proper post-operative wound care.

#### 1.    The Failure to Continue Pentasa

In his report, Dr. Korsten opined that Stelman "experienced a relapse of her Crohn's disease as a result of the withholding of Pentasa by the Bureau of Prisons between August 6th and roughly August 17th 2012." ECF No. 36-1 at 3 (Korsten Rep.). He identified the "failure to continue Pentasa in a patient whose Crohn's disease was in remission while on this drug" as a departure from the standard of medical care and specifically identified Dr. Bussanich as a physician who deviated from that standard. Id.

During his deposition, Dr. Korsten testified that the physicians at MCC New York deviated from the standard of medical care by prescribing Stelman generic mesalamine instead of Pentasa. Dr. Korsten acknowledged that Pentasa's active ingredient was mesalamine, but opined that "not all mesalamines are the same." ECF No. 36-2 at 10. Specifically, the difference "is the coating"; Pentasa "has a coating that permits the chemical to be slowly released in the small bowel." Id. For that reason, he testified, Pentasa "has been shown to be useful in the treatment of small bowel Crohn's disease." Id. at 11. He acknowledged that he did not know the type of coating on the generic mesalamine that Stelman received at MCC New York, but

maintained "that the drug she should have been on was the same drug that she was on previously, and that was Pentasa." Id. at 12.

The Government does not challenge Dr. Korsten's testimony with respect to Stelman's treatment at FCI Miami. But, with respect to her treatment at MCC New York, the Government argues that Dr. Korsten engaged in "pure speculation" in opining that Stelman should have received "Pentasa, and *only* Pentasa." ECF No. 35 at 29 (Mem. of Law). In the Government's view, Dr. Korsten has not adequately explained why Stelman's treatment with generic mesalamine at MCC New York did not meet the standard of care.

An expert relying on personal experience "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 Advisory Comm. Notes, 2000 Amendments. "And while an expert's opinion may in some circumstances be sufficiently reliable even when only based on the expert's experience, it may not be based solely on the expert's 'instinct.'" Vale v. United States, 10-cv-4270 (PKC) (LB), 2015 WL 5773902, at *12 (E.D.N.Y. Aug. 28, 2015), report and recommendation adopted, 2015 WL 5773729 (Sept. 30, 2015).

Dr. Korsten used his personal experience to evaluate Stelman's care and did not rely on mere instinct. According to Dr. Korsten, who treats dozens of patients each week for gastroenterological disease, a doctor should maintain a Crohn's disease patient on the same drug that has held the disease in remission. He testified that various methalamine drugs have different coatings that release the drug in different parts of the gastrointestinal system. The preferred practice, in his view, was to stick with the pill whose coating had been shown by an extended period of remission to be effective at delivering the drug to the correct part of the body. He further testified that Stelman's relapse should have indicated to Dr. Bussanich that she should be

placed *back* on Pentasa, in order to remit her disease. Although Dr. Korsten admitted that he did

not know what coating was used on the generic mesalamine in MCC New York's formulary, he

maintained that Stelman should have been placed on the same drug that controlled her Crohn's

disease prior to incarceration. In his view Pentasa had been proven to work and the generic

mesalamine had not. The Government may have a robust response to Dr. Korsten's

assessment—for example an expert who testifies that generic mesalamine would be just as

effective as Pentasa for treating Stelman's condition. But the Government's challenge goes to

weight, not admissibility. The Government has not shown that Dr. Korsten's opinion was mere

speculation or outside his expertise. Accordingly, the evidence is admissible for the purpose of

establishing the standard of care.

### 2.      The Failure to Treat Stelman's Anxiety

Dr. Korsten also opined that it was "probable that the failure to treat the plaintiff's severe

anxiety during imprisonment was an additional factor causing the relapse of her Crohn's

disease." ECF No. 36-2 at 4.

During his deposition, Dr. Korsten testified that anxiety "can exacerbate symptoms in

Crohn's, and it's just known clinically" that patients benefit from anti-anxiety medication. ECF

No. 36-3 at 3. He testified that the failure to provide Stelman with such medication before

August 17, 2012, probably contributed to the relapse of her Crohn's disease. When asked

whether BOP officials met the standard of care after August 17, when they treated her with

anxiety medication, Dr. Korsten stated that Stelman "should have been continued" on any anti-

anxiety medication she had taken in the Dominican Republic. Id. at 6. He admitted, however,

that he did not know what medications she had taken in the Dominican Republic or how those

medications differed from the buspirone the BOP prescribed her on August 18, 2012.

The Government argues that Dr. Korsten's testimony regarding Stelman's anxiety medication is inadmissible because it is speculative and conclusory. The Court agrees insofar as Dr. Korsten's testimony concerned Stelman's treatment at MCC New York.

"An expert's opinions that are without factual basis and are based on speculation or conjecture" are "inappropriate material for consideration on a motion for summary judgment." Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 311 (2d Cir. 2008). Dr. Korsten admitted that he did not know what anti-anxiety medications, if any, Stelman had been taking before her incarceration. Accordingly, he has no basis for concluding that the prescription of Buspar was an inappropriate substitution or an inappropriate drug for treating Stelman's anxiety. Dr. Korsten is not an expert in psychiatry or psychology and has no basis for evaluating treatment decisions in those domains. Nor did he refer to any expert treatises, books, or articles that would tend to show that the BOP's treatment of Stelman's anxiety fell below the standard of care after August 18, 2012. The Court will disregard Dr. Korsten's testimony with respect to Stelman's treatment with psychiatric medication at MCC New York, and Dr. Korsten will be precluded from testifying on that matter at trial. With respect to Stelman's psychiatric care at FCI Miami, Dr. Korsten will be permitted to testify that untreated anxiety contributes to Crohn's disease flare-ups and that the failure to treat Stelman's anxiety may have led to her flare-up. He is not competent to testify regarding the standard of psychiatric care.

### 3.    Failure to Consult with Specialists

In his report, Dr. Korsten wrote that the "failure to request specialty consultations (gastroenterological and psychiatric) in a patient with a well-established history of Crohn's disease" deviated from the accepted standard of care. Dr. Korsten's report did not elaborate how

a consultation with an expert would have improved Stelman's gastroenterological or psychiatric

care. During his deposition, Dr. Korsten testified:

> A consultation with a gastroenterologist would have resulted in recommendations for more specific treatment of the problem. I mean, there was no treatment for the first 10 days of her confinement, but then she was not doing well. And certainly at that point there were a lot of things you could institute from steroids, specifically, that can have short-term benefit, although you don't want to continue to give it for very long. There may have been— given that she was getting acutely ill, one of the new biologics might have been an option, biologics like those tumor necrosis factor antibodies, Remicade or Humira. She was getting sick, and nothing much was being done to abort the increasing severity of her illness.

ECF No. 36-4 at 13. He also opined that a "psychiatric consultation would have resulted in

specific recommendations for more adequate treatment of anxiety and depression, both of which

can exacerbate symptom expression and should have been provided." Id.

The Government argues that Dr. Korsten's opinion with respect to consultation with

specialists is speculative and conclusory. According to the Government, Dr. Korsten did not

identify any specific intervention that would have improved Stelman's care, and that his logic

was circular: had the BOP physicians consulted with specialists, they would have received

specialized advice about how to treat Stelman.

Dr. Korsten will be precluded from testifying about the need to consult with psychiatric

specialists. He is not an expert in psychiatry or psychology and has no basis for concluding that

Stelman's mental health required specialist intervention. His opinion that specialist treatment

could have provided more adequate treatment is conclusory and not based on any expert

analysis. Accordingly, Dr. Korsten will be precluded from testifying at trial regarding the need to

see a psychiatric specialist, and his testimony will not be credited for the purposes of deciding

this motion.

Dr. Korsten's opinion regarding the need to consult with a gastroenterological specialist will not be admissible under Federal Rule of Evidence 403 because it is misleading and cumulative. Dr. Korsten is an expert in gastroenterology and has an adequate basis for opining that a patient with a history of Crohn's disease who has not received any treatment for 10 days and whose condition is swiftly deteriorating should be brought to see a gastroenterological specialist. But Dr. Korsten was unable to say what a specialist would have done differently than what Dr. Bussanich did. Instead, he speculates about a number of interventions that the specialist might have recommended without identifying any specific course of treatment. His testimony would leave the factfinder to speculative whether some different, unspecified course of treatment than the one Dr. Bussanich took would have prevented Stelman's bowel resection surgery. And it would require the Government to prepare to rebut an endless stream of counterfactual courses of treatment without knowing which ones Stelman will rely upon at trial.

### 4.    Wound Care

Dr. Korsten's report stated that the "wound care received by the plaintiff after her ileocolectomy and abdominal wall surgery was substandard according to testimony at her deposition on July 21, 2015." Dr. Korsten's report did not set forth any particular standard for post-operative wound care, and, because his review of Stelman's medical covered only the period August 2012 until January 2013, he did not opine on the wound care Stelman received in September 2013.

In her opposition to the Government's summary judgment motion, Stelman makes clear that she is not pursuing a malpractice claim based on the wound care following her 2012 surgeries. She will pursue a claim based only on her September 2013 wound care. Accordingly, Dr. Korsten's testimony regarding the 2012 post-surgery wound care should be excluded. Nor

can he tailor his testimony to the post-operative care in September 2013. Expert testimony "exceeding the bounds of the expert's report is excludable pursuant to Rule 37(c)(1)." In re Kreta Shipping, S.A., 181 F.R.D. 273, 275 (S.D.N.Y. 1998). Courts "will not admit supplemental expert evidence following the close of discovery when it expounds a wholly new and complex approach designed to fill a significant and logical gap in the first report, as doing so would eviscerate the purpose of the expert disclosure rules." Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co., Ltd., 769 F. Supp. 2d 269, 279 (S.D.N.Y. 2011) (internal quotation marks and alterations omitted). Dr. Korsten did not specify a standard of care for post-operative wound treatment in his expert report or apply that standard to Stelman's wound care in September 2013. The Court will not permit him to revisit his report at this late stage of the litigation to address those deficiencies. Accordingly, Dr. Korsten will be precluded at trial from testifying about whether Stelman's wound care was substandard.

### D. Material Questions of Fact Prevent the Court from Entering Summary Judgment on Certain Medical Malpractice Claims

The Government argues that it is entitled to summary judgment on Stelman's medical malpractice claims arising from her incarceration at MCC New York because she cannot make a prima facie showing of medical malpractice based on the record evidence. According to the Government, without Dr. Korsten's expert opinion, Stelman cannot establish that BOP personnel deviated from the standard of care because she cannot establish what that standard is. But, for the reasons given above, Dr. Korsten's testimony is admissible in part. Accordingly, the Court will examine each of Stelman's particular claims of malpractice to determine whether summary judgment is appropriate.

Under the FTCA, Stelman may sue the Government for medical malpractice as defined by state law. 28 U.S.C. § 1346(b)(1). Under New York law, a medical malpractice plaintiff must

prove "(1) that the defendant breached the standard of care in the community, and (2) that the breach proximately caused the plaintiff's injuries." Arkin v. Gittleson, 32 F.3d 658, 664 (2d Cir. 1994). Further, "except as to matters within the ordinary experience and knowledge of laymen," an expert medical opinion "is required to make out both of these elements." Milano v. Freed, 64 F.3d 91, 95 (2d Cir. 1995) (internal quotation marks omitted).

Stelman alleges four separate incidents of medical malpractice while she was incarcerated at MCC New York: (1) failure to provide proper Crohn's disease medication; (2) failure to treat her anxiety properly; (3) failure to consult with gastroenterological and psychiatric specialists; and (4) improper wound care. The Court will examine each in turn.

### 1.      Failure to Provide Proper Crohn's Medication

Stelman argues that MCC New York should have prescribed her Pentasa to treat her Crohn's disease. She bolsters her claim with the opinion of Dr. Korsten, who will testify that the standard of care for a patient with a history of Crohn's disease in remission is to continue that patient on *the same drug* that has kept the disease in remission. The Government argues that the provision of generic mesalamine, the active ingredient of Pentasa, was sufficient to treat Stelman. A material question of fact remains, however, regarding whether generic mesalamine was a sufficient substitute for Pentasa. Dr. Korsten maintains that it was not and the inadequacy of the generic drug was proven when Stelman's Crohn's disease continued to worsen. The Court reserves judgment on this fact question until trial, and summary judgment is denied.

### 2.      Failure to Provide Proper Psychiatric Care

Stelman argues that MCC New York did not provide her proper psychiatric care, leading to anxiety that exacerbated her Crohn's disease. She has not, however, presented any admissible expert testimony establishing the standard of psychiatric care. The standard of psychiatric care

for a person with a history of both anxiety and Crohn's disease is not a matter within the ordinary experience of knowledge of a layperson. Accordingly, Stelman cannot prove that MCC New York's psychiatric care amounted to malpractice, and the Court grants the Government summary judgment on this question.

### 3.      Failure to Consult with Specialists

Stelman argues that MCC New York physicians should have consulted with gastroenterological specialists before treating reemergent Crohn's disease. Her claim relies on the expert opinion of Dr. Korsten. But, as the Court has determined, Dr. Korsten's testimony regarding consultations with gastroenterological specialists will not be admissible under Federal Rule of Evidence 403 because it is too speculative. Dr. Korsten has not identified any specific intervention that a specialist would have recommended, other than prescribing Pentasa, and instead offers an array of speculative courses of treatment without identifying any particular one as useful. Without testimony regarding the specific intervention that the Government should have made but did not, Stelman cannot prove that the failure to consult with a gastroenterological specialist was malpractice.

Stelman also argues that MCC New York physicians should have consulted with a psychiatric specialist to develop her treatment plan. She has not, however, offered any admissible expert testimony regarding the psychiatric standard of care. The standard of psychiatric care for a person with a history of both anxiety and Crohn's disease is not a matter within the ordinary experience and knowledge of a layperson. Accordingly, Stelman cannot prove that MCC New York's failure to consult with a psychiatric specialist amounted to malpractice, and the Court grants the Government summary judgment on this question.

### 4.      Wound Care

Stelman argues that MCC New York failed to provide adequate wound care following her September 2013 hernia surgery. She abandons any argument regarding the wound care following her October 2012 surgery. See ECF No. 39-1 at 16 (Pl.'s Mem. of Law) ("Although Dr. Korsten's report also alluded to the wound care following her bowl resection surgery in October 2012, that treatment is not part of the claim."). The Government argues that Stelman cannot prove that her 2013 wound care fell below the standard of care because she lacks any admissible expert testimony establishing the standard of care.

To be sure, Stelman has not provided any expert evidence establishing the standard of care for post-operative wounds. In his expert report, Dr. Korsten opined that Stelman's *October 2012* wound care fell below the standard of care, but he did not articulate how or give any opinion about what the relevant standard of care should be. Moreover, he did not examine her medical records from September 2013 and had no basis for opining on the cause of that infection. Accordingly, Dr. Korsten will be precluded at trial from testifying about Stelman's wound care, and his testimony regarding the standard of care for post-operative wounds is inadmissible for the purpose of this motion.

The Court, however, concludes that it is premature to decide whether MCC New York provided Stelman with sufficient wound care. In the twenty-first century, the causal connection between dirty wounds and infection is within the "ordinary experience and knowledge of laymen." Milano, 64 F.3d at 95. Stelman claims that MCC New York forced her to change her own bandages in her cell without enough gauze or medical tape to do the job right. The parties dispute whether she had a bandage change on September 22, 23, and 26, 2013. The medical records indicate that she reported soaked bandages and frequent discharge from the wound. A

factfinder crediting Stelman's version of events could conclude that Stelman was forced to clean her own wound in an unclean jail cell without adequate supplies. Without having to specify precisely what would have been required for adequate wound care, the factfinder could conclude that Stelman's treatment fell well below that standard. Accordingly, the Court will not grant summary judgment on this claim.

## CONCLUSION

The Court GRANTS the motion with respect to Stelman's constitutional claims, negligence claims, and malpractice claims that relate to psychiatric care and the failure to consult with medical specialists while detained at MCC New York. The motion is otherwise DENIED. The Clerk of Court is instructed to terminate the motion docketed at ECF No. 33. A status conference is scheduled for Friday, October 7, 2016, at 2:00 p.m., in Courtroom 219, Thurgood Marshall U.S. Courthouse, 40 Foley Square, New York, New York. The parties should be prepared to propose a reasonable schedule for pretrial briefing and to discuss their interest in a referral to a different magistrate judge for the purposes of a settlement conference.

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

DATED:      New York, New York
            September 21, 2016